CHELSEA A. HARRIS,

        Plaintiff,

                                  COMPLAINT
                                  Civil Action No. _____
                                  [Trial By Jury Demanded]

STATE OF WISCONSIN
DEPARTMENT OF HEALTH SERVICES,
a government agency;

UNITEDHEALTHCARE OF WISCONSIN, INC.,
a domestic insurance company,

        Involuntary Plaintiffs,

v.

BROWN COUNTY, a body corporate;

WISCONSIN MUNICIPAL MUTUAL INSURANCE COMPANY,
a domestic insurance company;

WELLPATH, LLC (F/K/A CORRECT CARE SOLUTIONS, LLC),
a foreign company;

LEEANN JUNTUNEN-SULLIVAN, individually;

DIANE JENSEN, individually;
and

ANDREW RUPNOW, individually,

        Defendants.

## I.      INTRODUCTION

1.     This is a civil rights action brought by Chelsea A. Harris for damages under 42

U.S.C. § 1983. State law negligence claims are also asserted. Ms. Harris was denied seriously

1

needed medical and nutritional care as a result of the defendants' conduct, which was objectively unreasonable, exhibited a substantial departure from accepted professional standards, and was also deliberately indifferent to Ms. Harris' known and obvious serious medical needs. Defendants' conduct caused significant physical and emotional injuries to Ms. Harris in violation of the Fourteenth and Eighth Amendments to the United States Constitution and state law.

2.     Ms. Harris' significant pain and suffering in the Brown County Jail resulted from her detention for failure to pay a civil municipal court forfeiture and her medical inability to appear at a subsequent order to show cause civil hearing.

## II.     JURISDICTION AND VENUE

3.     This Court has original jurisdiction over this matter under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4).

4.     The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

5.     Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because the conduct giving rise to Plaintiff's claims occurred in this judicial district (Brown County).

## III.     PARTIES

6.     Plaintiff Chelsea A. Harris is an adult citizen and a resident of the State of Wisconsin. At all times material hereto, Ms. Harris was detained at the Brown County Jail while pregnant, under the direct custody, control, and supervision of the Defendants.

7.     Involuntary Plaintiff State of Wisconsin-Department of Health Services (hereinafter "WI DHS") is a government agency with a principal office address of 1 West Wilson Street, P.O. Box 309, Madison, WI 53701-0309. WI DHS operates and administers the

state's Medicaid program a/k/a Title XIX and BadgerCare Plus, and has paid certain hospital, medical, and related expenses on Ms. Harris' behalf as a result of the injuries she and Baby "J." sustained as set forth herein. WI DHS may have no legal right to subrogation or reimbursement despite its payment of benefits in the past or the future, but by reason of such payments, the WI DHS is a proper party herein.

8. Involuntary Plaintiff UnitedHealthcare of Wisconsin, Inc. ("UHC") is a domestic insurance company and a Wisconsin Health Maintenance Organization, which administers Wisconsin's Medicaid program. UHC's statutory home office address is located at 10701 West Research Drive, Wauwatosa, WI 53226, and its registered agent is CT Corporation System with an address of 301 South Bedford Street, Suite 1, Madison, WI 53703. UHC has paid certain hospital, medical, and related expenses on Ms. Harris' behalf as a result of the injuries she and Baby "J." sustained as set forth herein. UHC may have no legal right to subrogation or reimbursement despite its payment of benefits in the past or the future, but by reason of such payments, the UHC is a proper party herein.

9. Defendant Brown County is a body corporate, organized under Wisconsin Statutes Chapter 59 and located at 305 East Walnut Street, Green Bay, Wisconsin 54301. Pursuant to Wis. Stat. § 59.01, Brown County is authorized, *inter alia*, to sue and be sued. Brown County is a "person" for purposes of 42 U.S.C. § 1983. Brown County owns and operates the Brown County Jail (hereinafter "BCJ"). Acting through the Brown County Sheriff's Office, the County is responsible for training, supervising, and disciplining jail employees. Brown County is also responsible for adopting, implementing, and enforcing jail policies and practices, and ensuring that jail conditions and the medical treatment, including nutrition, of detainees complies with the United States Constitution and other federal and state laws. Pursuant to Wis.

3

Stat. § 59.27(1), Brown County acting through its Sheriff in his official capacity, cannot delegate away its constitutional duties regarding medical care for detainees. The County is liable for the jail policies, practices, and customs that caused the harm alleged, *infra*. Under Wis. Stat. § 895.46(1)(a), the County is required to pay or indemnify all judgments, including compensatory and punitive damages, costs, disbursements, and reasonable attorney's fees that may be awarded against its officials and employees.

10.     Defendant Wisconsin Municipal Mutual Insurance Company ("WMMIC") is a domestic insurance company that issued an insurance policy insuring Brown County and its employees and agents against all liability imposed by law, and is a proper party defendant herein. WMMIC's principal business address is 4781 Hayes Road, Suite 201, Madison, Wisconsin 53704. Pursuant to the terms of this policy and Wisconsin law, defendant WMMIC is directly liable to Plaintiff for the negligent conduct of its insureds described herein. The policy was in full force and effect at the date and time of the events described below.

11.     Defendant Wellpath, LLC ("Wellpath") is a foreign for-profit corporation incorporated under the laws of the State of Delaware, doing business in the State of Wisconsin. Wellpath's principal office is located at 1283 Murfreesboro Road, Suite 500, Nashville, Tennessee 37217, and its Registered Agent is Corporate Creations Network, Inc., 4650 West Spencer Street, Appleton, Wisconsin 54914. As is relevant herein, Wellpath is a "person" for purposes of 42 U.S.C. § 1983. Following the incidents described herein, Correct Care Solutions ("CCS") changed its name to Wellpath, LLC. Upon information and belief, Wellpath is responsible for the assets and liabilities of CCS. CCS's acts and omissions at the BCJ, including the acts and omissions of its employees and agents, were conducted under color of state law. Wellpath, LLC is legally liable for all CCS policies and practices referenced herein

4

and for the acts and omissions of its employees, agents, and independent contractors, whether located at the BCJ or elsewhere.

12.     Defendant LeeAnn Juntunen-Sullivan resides in the State of Wisconsin. She was employed by Wellpath as a Registered Nurse at the BCJ during the relevant time period. In that role, she was responsible for the health and welfare of detainees confined in the BCJ, including Ms. Harris. Defendant Juntunen-Sullivan is sued in her individual capacity and acted under color of state law and within the scope of her employment with Wellpath.

13.     Defendant Diane Jensen resides in the State of Wisconsin. She was a Registered Nurse at the BCJ and an employee of Wellpath during the relevant time period. In that role, she was responsible for the health and welfare of detainees confined in the BCJ, including Ms. Harris. Defendant Jensen is sued in her individual capacity and acted under color of state law and within the scope of her employment with Wellpath.

14.     Defendant Andrew Rupnow resides in the State of Wisconsin. He was a correctional officer at the BCJ and an employee of the Brown County Sheriff's Office during the relevant time period. In that role, he was responsible for the health, safety, security, and welfare of detainees confined in the jail, including Ms. Harris. Defendant Rupnow is sued in his individual capacity and acted under color of state law and within the scope of his employment with the Brown County Sheriff's Office.

## IV.     STATEMENT OF FACTS

### A.  Ms. Harris' Detention

15.     On February 9, 2018, Chelsea Harris, a 28-year-old female, was taken into custody by the De Pere Police Department and detained at the Brown County Jail under the care,

custody, and control of Brown County and its medical contractors including the above-named defendants.

16.     Ms. Harris was detained pursuant to a civil order issued by the Green Bay Municipal Court for alleged failure to pay a civil municipal violation ticket.

17.     During the course of Ms. Harris' detention at BCJ, she was never brought before the Municipal Court nor subject to any legal proceedings regarding the municipal ticket.

### B. Ms. Harris' Medical Intake

18.     A contract was then in effect between Brown County and CCS (n/k/a Wellpath), under which Wellpath was required to provide, *inter alia*, medical screening, care, and treatment to persons at the Brown County Jail.

19.     Wellpath's contract with Brown County for provision of comprehensive medical services at the Brown County Jail required Wellpath and its employees, agents, and independent contractors, including the above-named defendants, to fulfill all constitutionally and statutorily required medical duties of the Brown County Sheriff for persons in custody.

20.     At the time of her detention, Ms. Harris was approximately 26 weeks pregnant and her pregnancy was classified as "high-risk" by her two private medical doctors.

### C. Failure to Provide Ms. Harris with her Medically Prescribed Ensure and Appropriate Special Needs Patient Pregnancy Diet.

21.     During BCJ booking intake, Ms. Harris specifically informed the non-medical intake officer that she was 26 weeks into a high-risk pregnancy and was prescribed Ensure by her high-risk obstetrics physician due to her medical difficulty gaining weight. This information was noted in the "Booking Observation Report" form completed at intake. During the entire period of her detention, Ms. Harris never received her medically ordered daily

6

Ensure; and, as a result of this denial, Ms. Harris lost weight while detained at the BCJ, during a critical period of time in her high-risk pregnancy.

22. Ms. Harris' fiancé brought Ms. Harris' Ensure prescription to the BCJ on February 10, 2018. However, correctional staff told him that they would not give Ms. Harris her Ensure and that "the nursing staff would decide if it was necessary." Upon information and belief, the nursing staff did not even attempt to make such a determination.

23. Wellpath Policy F-02 required a "Special Diet" for pregnant detainees. Wellpath Policy G-02 required the *per se* designation of a pregnant female, like Ms. Harris, as a "special needs" patient to be documented on the "problem list" of the patient's medical summary. Furthermore, Wellpath Policy G-02 mandated the creation of "individualized treatment plans" for patients with special needs, which were to be "developed by a physician or other qualified clinician at the time the serious medical or mental health condition is identified."

24. Despite Plaintiff's repeated Open Records requests sent to the Brown County Sheriff's Office in April and July 2018, Brown County failed to provide Plaintiff with the requested relevant contract between Brown County and CCS. Upon information and belief, that contract expressly stated that Wellpath was required to abide by the National Commission on Correctional Healthcare ("NCCHC") Standards with regard to the care of pregnant inmates/detainees.

25. The "essential" NCCHC Standard P-F-05 expressly states, *inter alia*, that "[p]regnant women who report bleeding *or symptoms of labor* such as pain or leaking fluid should be *immediately* evaluated by a qualified heath care professional; when an appropriately trained health professional is not on-site, there should be consultation with or transportation to the hospital." NCCHC Standard P-F-05 (emphasis added). The NCCHC Standards further

7

recognize that "obstetrical emergencies such as . . . preterm labor can arise at any point in pregnancy. Such emergencies *require immediate medical intervention and/or movement of the woman*." NCCHC Standard P-F-05 (emphasis added).

26.     Ms. Harris, who was in preterm labor, a recognized obstetrical emergency, was not immediately transported to the hospital nor was she ever evaluated by a qualified health care professional, which violated the express written NCCHC Standards and standards of professional judgment.

27.     NCCHC Standard P-F-05 and NCCHC policy statements state that pregnant women have additional nutritional needs important to the mother and baby's health, which require a pregnant woman's diet to "reflect national guidelines." Despite NCCHC's emphasis on the importance of adequate nutrition for a pregnant woman, Wellpath's policy requiring BCJ to provide a specialized diet for pregnant females, and Ms. Harris' known difficulty gaining weight, Brown County and Wellpath not only denied Ms. Harris her medically prescribed Ensure, but also failed to put Ms. Harris on an appropriate specialized diet for her pregnancy.

28.     Instead, in direct contradiction to national nutritional guidelines for pregnant women, Ms. Harris was given cold bologna sandwiches as a "pregnancy snack" pursuant to BCJ policy and practice.  Significantly, it is well-known that cold cuts and lunch meat, like bologna, are to be avoided by pregnant women because of the risk of Listeria, which can have catastrophic results for a pregnant woman, including preterm labor and fetal death. Brown County and Wellpath consciously ignored the known risk of danger to pregnant detainees and their unborn children at the BCJ and continued to provide them with a pregnancy snack that posed a substantial risk to their health and safety.

8

29.     A pregnancy snack is required to be given to all pregnant detainees/inmates at the BCJ and was not a replacement for Ms. Harris' Ensure. Ms. Harris was entitled to *both* an appropriate nutritional pregnancy snack in addition to her medically prescribed Ensure. However, BCJ and Wellpath deprived her of both.

### D.  Lack of Medical Care in General Population

30.     Brown County Jail Policies H12 and H3d required the *per se* designation of Ms. Harris' pregnancy as a "special health need" that required the Health Services Unit ("HSU") to create a specialized treatment plan for her.

31.     In violation of express Wellpath and BCJ written policies and standards of professional judgment, an individualized treatment plan was never created for Ms. Harris.

32.     Despite Ms. Harris' high-risk pregnancy, and in violation of express Wellpath and BCJ written policies and standards of professional judgment, Ms. Harris' "Patient Profile Summary" indicated "No Active Problems," "No Active Diets," and "No Active Special Needs."

33.     Instead of being placed in a special needs cell as required by her medical condition, Brown County and Wellpath placed Ms. Harris in general population and assigned her to the India Pod.

34.     Furthermore, in violation of express BCJ written Policy H12, which governs how HSU must respond to a pregnant detainee's medical complaints, and in violation of  standards of professional judgment, at no point did HSU "confer with a qualified obstetrical practitioner" to "coordinate treatment as appropriate for the well being of the inmate and unborn child" in response to Ms. Harris' medical complaints and obvious medical emergency. Instead, HSU and BCJ staff simply ignored Ms. Harris' obvious medical emergency and pleas for help.

9

35.     On the evening of February 9, 2018, Ms. Harris experienced a serious pregnancy-related medical emergency that caused great pain, suffering, and, ultimately, the premature birth of her child.

36.     A mandatory assessment of Ms. Harris was completed in her cell at approximately 10:40 PM on February 9, 2018 by Defendant Juntunen-Sullivan, RN. Ms. Harris, again, reported her high-risk pregnancy. Nurse Juntunen-Sullivan documented the following assessment in Ms. Harris' medical file: "Admits to sharp pain to low back for a week, worse today. This pain is accompanied by low, mid abd pain sharp and constant for the last 2 hours. Rates pain '9' on 1-10 scale." Ms. Harris also reported that she had experienced maroon colored vaginal discharge the day before. These are classic symptoms of preterm labor, which the NCCHC defines as an "obstetrical emergency" that requires immediate medical intervention and transportation to the hospital.

37.     Defendant Juntunen-Sullivan knew that the obviously serious nature of Ms. Harris' medical complaints of continuous sharp lower abdominal pain in a high-risk pregnancy evidenced a medical emergency that required immediate medical attention from a qualified medical provider.

38.     However, Defendant Juntunen-Sullivan did not seek immediate emergency medical attention or call 911, as she knew she was required to do. She did not even bother to report Ms. Harris' symptoms to an on-call doctor, much less a qualified obstetrical practitioner. Instead, she gave Ms. Harris a Tylenol and chose to ignore Ms. Harris' obvious medical emergency.

39.     At approximately 12:30 PM on February 10, 2018, Ms. Harris reported to Defendant BCJ Correctional Officer Rupnow, who had also worked in the India Pod the previous day, that she was still experiencing lower abdominal pain and that the single Tylenol

10

had not relieved her severe abdominal pain. Defendant Rupnow noted that Ms. Harris "was sitting in the dayroom and was leaning over and was crying," so he called for a nurse.

40.     Wellpath employee, Defendant Diane Jensen, RN, responded and took Ms. Harris to a laundry room within the housing unit.

41.     Ms. Harris reported to Defendant Jensen that she was still experiencing the same sharp lower abdominal pain she had reported the previous night. She additionally informed Defendant Jensen that she was a high-risk pregnancy, had bright yellowish/green vaginal discharge, and that it "felt like a human was trying to exit her body." Ms. Harris demanded to be taken to a hospital. Defendant Rupnow observed and overheard their conversation and also Ms. Harris' plea to be hospitalized; but, he took no action in response thereto.

42.     Contrary to the mandatory NCCHC Standard P-F-05, and knowing that Ms. Harris presented with classic signs of preterm labor, Defendant Jensen refused to send Ms. Harris to the hospital and stated that she had to call the on-call doctor. However, Defendant Jensen never called the on-call doctor, never consulted with a qualified obstetrical practitioner, and never bothered to check on Ms. Harris at any time thereafter. Defendant Jensen chose to do nothing to respond to Ms. Harris' obvious and serious medical emergency.

43.     Defendant Jensen knew from the obviously serious nature of Ms. Harris' medical complaints that:

        a.      reports of continuous sharp lower abdominal pain in a twenty-six (26) week
                high-risk pregnancy evidence a medical emergency that requires immediate
                medical attention from a qualified medical provider;

b.      reports of yellowish/green vaginal discharge in a pregnancy can signal serious infection that requires immediate medical attention from a qualified medical provider;

c.      a pregnant woman complaining of lower abdominal pain when coupled with vaginal discharge means that her cervix is dilating;

d.      premature labor can have serious and life-threatening consequences for both her and her premature infant; and

e.      reports from a known high-risk pregnant woman only twenty-six (26) weeks into her pregnancy that it "felt like a human was trying to exit her body" required immediate medical attention from a qualified medical provider.

44.     Despite this knowledge, and instead of reporting Ms. Harris' medical emergency to an on-call doctor or calling 911, Defendant Jensen told Defendant Rupnow that she was "done talking to Harris" and further told Ms. Harris "to go back to her cell." Defendant Rupnow also took no further action.

45.     After Defendant Jensen denied Ms. Harris' emergency demand to be taken to a hospital, Defendant Rupnow commanded her to go back to her cell, but Ms. Harris refused out of desperation for her medical crisis. She told Defendant Rupnow that if no one would send her to the hospital then she wanted to be "put on suicide watch." Ms. Harris knew that her pregnancy was dangerous to her health and the health of her unborn child. She concluded that being placed on suicide watch was the only option to receive desperately needed medical treatment and be monitored. Instead of calling for medical assistance, Defendant Rupnow called the Housing Corporal and Security to re-house her.

12

46.     Defendant Jensen and Defendant Rupnow both ignored Ms. Harris' request for medical attention despite the seriousness of her condition and their own observations of Ms. Harris' pain.

47.     A BCJ Housing Corporal arrived at the laundry room in response, and Ms. Harris also informed him that she needed to go to the hospital. However, the Housing Corporal refused to send Ms. Harris to the hospital, or take any responsive action.

48.     Ms. Harris' significant pain, suffering, and need for medical attention was obvious and further confirmed by Defendant Rupnow's own reported observations of Ms. Harris crying. However, instead of securing urgently needed medical care, Defendant Rupnow escorted Ms. Harris to the Lima Pod suicide watch and, in retaliation for her desperate pleas for medical care to Defendant Nurse Jensen and himself, reported her for punishment.

49.     Ms. Harris received a "Major Conduct Report" issued by a Brown County Jail Intake Corporal for "refusal to lockdown and for major disruption." She was punished with a sentence of four days of punitive segregation to be served after being cleared from suicide watch.

### E.  Placement on Suicide Watch and Lack of Medical Care

50.     BCJ Policy H16 governed "Assessment of Suicide Risk/Management of Suicidal Detainee" and required BCJ guards to conduct checks on detainees placed on suicide watch *every fifteen minutes*. This fifteen-minute mandatory inspection requirement was deliberately and routinely ignored by BCJ staff regarding Ms. Harris, although at approximately 2:20 PM on February 10, 2018, a BCJ Intake Officer did check on Ms. Harris and expressly reported in the jail logs that she was crying.

13

51. After Defendant Rupnow escorted Ms. Harris to suicide watch, she was not medically assessed for over ten hours.

52. Ms. Harris was finally seen on February 10, 2018, at approximately 11:30 PM, by Defendant Juntunen-Sullivan, RN, to whom she reported that she was still experiencing a significant amount of yellowish/green vaginal discharge. This is a classic symptom of preterm labor, which the NCCHC defines as an "obstetrical emergency" that requires immediate medical intervention and transportation to the hospital.

53. Defendant Juntunen-Sullivan knew from her prior medical interaction with Ms. Harris and from the obviously serious nature of Ms. Harris' medical complaints that yellowish/green vaginal discharge in a pregnancy evidences an infection that requires immediate medical attention from a qualified medical provider.

54. Despite the objective seriousness of Ms. Harris' reports, Defendant Juntunen-Sullivan once again chose to do nothing to provide desperately needed medical care to Ms. Harris.

55. Ms. Harris was cleared from suicide watch at approximately 11:40 AM on February 11, 2018, and was moved to India Pod cell 106, where she began her four-day punitive segregation penalty, which resulted from Defendant Rupnow's prior punitive report.

**F. Lack of Medical Care in Punitive Segregation**

56. During the evening of February 11, 2018, Ms. Harris was assessed in her cell by another Wellpath nurse, who noted that Ms. Harris was crying and stated "her pain was a 9/10 in the lower pelvic region." Ms. Harris also reported continued vaginal discharge.

14

57.     Despite being placed on medical observation later that night, Ms. Harris was neither checked on nor assessed by any Wellpath medical personnel until approximately 6:36 PM on February 14, 2018 – *three days later.*

58.     During her four-day punitive segregation:

a.      she continued to experience lower abdominal pain, which grew more severe with each passing day. Her pain was obvious and she spent her four-day punitive segregation curled up on her cot and crying;

b.      she continued to experience greenish/yellow vaginal discharge, which soaked through a feminine pad an hour;

c.      Ms. Harris requested feminine pads from guards, some of whom refused to provide them and one guard even dismissively informed her that she "did not need any pads because [she] [was] pregnant" and so she was forced to use toilet paper; and

d.      Ms. Harris continued to fear for her unborn child's life as she was helpless in a cell knowing that she could do absolutely nothing to get desperately required medical care.

59.     Despite knowing that Ms. Harris' pregnancy was high-risk, that she was experiencing excruciating lower abdominal pain for days and substantial amounts of yellow/green vaginal discharge, and was on medical observation, no Brown County or Wellpath medical professional came to assess Ms. Harris from the night of February 11 to the night of February 14.

15

### G. Ms. Harris is Finally Taken to the Hospital

60.     On February 14, 2018, Ms. Harris experienced contractions every four to five minutes and had not felt her baby move all day. Several times, Ms. Harris expressly told Defendant Rupnow, who was on duty in Ms. Harris' housing unit from 6:30 AM to 6:30 PM, that she was having contractions, that her baby was not moving, and that she needed to see a nurse or be taken to the hospital. In response to Ms. Harris' reports of severe abdominal pain, Defendant Rupnow looked at Ms. Harris and asked: "Still?." Despite his knowledge that Ms. Harris' severe abdominal pain had not subsided, Defendant Rupnow chose to do nothing.

61.     Defendant Rupnow already knew from his interactions with Ms. Harris on February 9th, 10th, and 11th that Ms. Harris was twenty-six (26) weeks into a high-risk pregnancy. He knew that she had been experiencing severe abdominal pain and vaginal discharge since February 9th. Defendant Rupnow's own observation of Ms. Harris crying on February 10th further evidences his knowledge that Ms. Harris was experiencing a medical emergency. When Ms. Harris additionally reported to Defendant Rupnow on February 14th that her severe abdominal pain had worsened and requested to see a nurse, Defendant Rupnow refused. Instead, he once again responded to Ms. Harris' obvious medical emergency by doing nothing.

62.     Ms. Harris' pleas for help were also ignored by BCJ staff when she was heard gasping in pain, struggling to breathe, and crying doubled over in pain while having contractions during a phone conversation with her fiancé that was monitored and observed by BCJ staff.

63.     During another monitored phone call with her fiancé, Ms. Harris stated that she was in severe pain and was extremely emotionally distressed from the pain of her contractions, which was exacerbated by BCJ's and Wellpath's ongoing deliberate indifference to her pleas

16

for help. After this phone call, Ms. Harris' fiancé called the BCJ front desk to express his concern for Ms. Harris and his unborn daughter's life.

64.     At approximately 6:35 PM on February 14, 2018, Ms. Harris yet again requested to see a nurse.

65.     When a Wellpath nurse finally arrived at Ms. Harris' cell three hours later, Ms. Harris reported that she continued to have contractions that she described as constant, stabbing lower pelvic pain, and she reported green/yellow vaginal discharge. That nurse immediately contacted the on-call nurse practitioner, who directed the nurse to immediately send Ms. Harris to the local hospital emergency room.

### H. Treatment and Prolonged Hospitalization

66.     When Ms. Harris arrived at the emergency room, she was immediately taken to the labor and delivery unit where it was determined that she was dilated four (4) centimeters and had experienced a preterm, premature rupture of membranes. She was immediately given medication to stop labor and postpone delivery as long as possible and was also given broad-spectrum antibiotics for a suspected infection.

67.     Ms. Harris remained hospitalized for her serious medical conditions, significantly exacerbated by her lack of medical treatment at the BCJ, for almost two weeks.

68.     On February 25, 2018, Ms. Harris gave birth to a Baby Girl, "J." who was not due until May 19, and who weighed only two (2) pounds and ten (10) ounces.

69.     As a direct consequence of the constitutionally deficient medical care Ms. Harris received in the Brown County Jail for four days, she was subjected to unnecessary pain and suffering during a labor that spanned for over ten (10) and one-half days.

17

70.     Baby girl "J." remained in the neonatal intensive care unit ("NICU") for over two and a half months, and was not released until May 6, 2018.

71.     As a direct consequence of the deficient medical care Ms. Harris received in the Brown County Jail, Ms. Harris suffered a loss of society and companionship with Baby Girl "J." for the first two and a half months of her daughter's life. Ms. Harris was unable to hold or even touch Baby Girl "J." for the first 72 hours of her life. Ms. Harris felt like a helpless bystander observing her fragile new baby in an incubator, hooked up to machines, and fighting for her life. Ms. Harris was unable to breastfeed or hold Baby Girl "J." when she cried, and was unable to take her daughter home for two and a half months. Instead, Ms. Harris left her baby every night fearing that she would not be alive the next day. Even after Baby Girl "J." was released from the hospital, the direct consequences of the deficient medical care her mother received at the BCJ continued. Ms. Harris had to hire a home visit nurse to provide weekly medical care to Baby Girl "J." resulting from her premature birth and also to treat medical concerns regarding her eyes, hearing, and low birth weight caused by her premature birth.

## V.     STATEMENT OF CLAIMS

### Constitutional Claims

72.     Brown County took Chelsea Harris into legal and physical custody as a civil detainee, thereby establishing a special custodial and supervisory relationship toward her by Brown County and the individually named defendants herein to provide necessary medical care. Brown County contractually delegated and shared this duty with Wellpath. This special custodial and supervisory relationship consequently gave rise to affirmative contractual legal duties by Wellpath and its employees, agents, and contractors to secure Ms. Harris' liberty

interests and rights, including her physical safety, essential medical care and treatment, and her right to be free from unnecessary pain and suffering, substantive rights protected by the Fourteenth and Eighth Amendments to the U.S. Constitution – rights which Brown County and Wellpath violated.

73. Brown County and Wellpath authorized, tolerated, ratified, permitted, or acquiesced in policies, practices, and customs, oral and written, pronounced, and *de facto*, including detainee medical and nutritional dietary decisions made irrespective of appropriate medical judgment, which were objectively unreasonable and exhibited substantial departure from accepted professional judgment, practices, and/or standards, and which were also deliberately indifferent to the safety and suffering of detainees with serious medical conditions, including Ms. Harris. These policies, practices, and customs were the moving force which caused the deprivation of plaintiff's constitutional rights.

74. Each individual defendant, LeeAnn Juntunen-Sullivan, RN, Diane Jensen, RN, and Andrew Rupnow, is liable under 42 U.S.C. § 1983 for violating Ms. Harris' rights under the Fourteenth and Eighth Amendments to the United States Constitution by denying her necessary medical care. Each defendant acted objectively unreasonably, with an absence of professional judgment, and with deliberate indifference to Ms. Harris' obvious and known serious medical needs. Each defendant was aware of the foreseeable risks associated with his or her actions and inactions, which caused Ms. Harris to suffer unnecessary physical and emotional pain, injury, and loss of society and companionship with Baby Girl "J." in violation of her Fourteenth and Eighth Amendment rights.

19

### State Law Negligence Claims

75.    Pursuant to Wis. Stat. § 893.80(1d)(a), on June 1, 2018, counsel for Ms. Harris served the Brown County Sheriff's Office, Brown County Clerk, and Wellpath with a written Notice of Circumstances of Injury.

76.    Pursuant to Wis. Stat. § 893.80(1d)(b), on October 10, 2019, counsel for Ms. Harris served the Brown County Sheriff's Office, Brown County Clerk, and Wellpath with a written Notice of Claim.

77.    On January 13, 2020, Brown County served Ms. Harris with a formal notice of disallowance of the claim.

78.    The conduct of Defendants Brown County, Wellpath, and the above-named individual defendants violated their respective duties of care toward the plaintiff and were a substantial factor in causing Ms. Harris' injuries.

79.    Defendants Juntunen-Sullivan, RN, Jensen, RN, and Rupnow negligently ignored Ms. Harris' known complaints and their own observations of her serious medical condition.

80.    The negligence of defendants Brown County, Wellpath, Juntunen-Sullivan, Jensen, and Rupnow caused Ms. Harris pain, suffering, and injury.

81.    Wellpath, through its employees and agents, was negligent in the assessment, medication management, treatment, and rendering of medical care to Ms. Harris, which caused pain and suffering and emotional distress and other injuries, and Wellpath is liable for the plaintiff's injuries sustained as a result of the negligent acts of its employees and agents.

82.    Defendant Wellpath negligently failed to adequately train and supervise its employees and agents at the Brown County Jail, which caused Ms. Harris' pain and suffering and injury.

83. Defendants Wellpath and Brown County are liable for all negligent acts and omissions of their employees, agents, and contractors.

84. Defendant WMMIC is also liable for all conduct of Brown County and its employees, agents, and contractors.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully demands a jury trial and prays that this Court:

1. Enter judgment for plaintiff and against each defendant, jointly and severally, awarding compensatory damages against each defendant, and punitive damages against each defendant except Brown County.

2. Award pre-judgment and post-judgment interest, together with costs, disbursements, and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

3. Award such other relief as may be just and equitable.

4. Ms. Harris also seeks a determination as to the amount, if any, owed to the Involuntary Plaintiffs.

Dated at Milwaukee, Wisconsin, this 6th day of March, 2020.

FIRST, ALBRECHT & BLONDIS, s.c.
Attorneys for Plaintiff

s/James P. End
James P. End
State Bar. No. 1032307
jend@fabattorneys.com

s/Lawrence G. Albrecht
Lawrence G. Albrecht
State Bar No. 1015668
lalbrecht@fabattorneys.com

21

s/Alexa C. Bradley
Alexa C. Bradley
State Bar No. 1102009
abradley@fabattorneys.com

Broadway Theatre Center
158 North Broadway, Suite 600
Milwaukee, WI 53202
Telephone: (414) 271-1972
Facsimile: (414) 271-1511