UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHELSEA A. HARRIS,

    Plaintiff,

UNITEDHEALTHCARE OF WISCONSIN, INC.,
a domestic insurance company,

    Involuntary Plaintiff,

v.

WELLPATH, LLC (F/K/A CORRECT CARE SOLUTIONS, LLC),
a foreign company;

LEEANN JUNTUNEN-SULLIVAN (N/K/A "KOERBER"), individually;

DIANE JENSEN, individually;

JESSICA DENISSEN, individually; and

ADEYEMI FATOKI, M.D., individually,

    Defendants.

FIRST AMENDED COMPLAINT
Civil Action No.: 20-cv-00373
[Trial By Jury Demanded]

## I.     INTRODUCTION

1.     This is a civil rights action brought by Chelsea A. Harris for damages under 42 U.S.C. § 1983. State law negligence claims are also asserted. Ms. Harris was denied seriously needed medical care as a result of the defendants' conduct, which was objectively unreasonable, exhibited a substantial departure from accepted professional standards, and was also deliberately indifferent to Ms. Harris' known and obvious serious medical needs.

1

Defendants' conduct caused significant physical and emotional injuries to Ms. Harris in violation of the Fourteenth and Eighth Amendments to the United States Constitution and state law.

2. Ms. Harris' significant pain and suffering in the Brown County Jail resulted from her detention for failure to pay a civil municipal court forfeiture and her medical inability to appear at a subsequent order to show cause civil hearing.

## II. JURISDICTION AND VENUE

3. This Court has original jurisdiction over this matter under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4).

4. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

5. Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because the conduct giving rise to Plaintiff's claims occurred in this judicial district (Brown County).

## III. PARTIES

6. Plaintiff Chelsea A. Harris is an adult citizen and a resident of the State of Wisconsin. At all times material hereto, Ms. Harris was detained at the Brown County Jail while pregnant, under the direct custody, control, and supervision of the Defendants.

7. Involuntary Plaintiff UnitedHealthcare of Wisconsin, Inc. ("UHC") is a domestic insurance company and a Wisconsin Health Maintenance Organization, which administers Wisconsin's Medicaid program. UHC's statutory home office address is located at 10701 West Research Drive, Wauwatosa, WI 53226, and its registered agent is CT Corporation System with an address of 301 South Bedford Street, Suite 1, Madison, WI 53703. UHC has paid certain hospital, medical, and related expenses on Ms. Harris' behalf as a result of the injuries

she and Baby "J." sustained as set forth herein. UHC may have no legal right to subrogation or reimbursement despite its payment of benefits in the past or the future, but by reason of such payments, the UHC is a proper party herein.

8. Defendant Wellpath, LLC ("Wellpath") is a foreign for-profit corporation incorporated under the laws of the State of Delaware, doing business in the State of Wisconsin. Wellpath's principal office is located at 1283 Murfreesboro Road, Suite 500, Nashville, Tennessee 37217, and its Registered Agent is Corporate Creations Network, Inc., 4650 West Spencer Street, Appleton, Wisconsin 54914. As is relevant herein, Wellpath is a "person" for purposes of 42 U.S.C. § 1983. Following the incidents described herein, Correct Care Solutions ("CCS") changed its name to Wellpath, LLC. Upon information and belief, Wellpath is responsible for the assets and liabilities of CCS. CCS's acts and omissions at the BCJ, including the acts and omissions of its employees and agents, were conducted under color of state law. Wellpath, LLC is legally liable for all CCS policies and practices referenced herein and for the acts and omissions of its employees, agents, and independent contractors, whether located at the BCJ or elsewhere.

9. Defendant LeeAnn Juntunen-Sullivan resides in the State of Wisconsin. She was employed by Wellpath as a Registered Nurse at the BCJ during the relevant time period. In that role, she was responsible for the health and welfare of detainees confined in the BCJ, including Ms. Harris. Defendant Juntunen-Sullivan is sued in her individual capacity and acted under color of state law and within the scope of her employment with Wellpath.

10. Defendant Diane Jensen resides in the State of Wisconsin. She was a Registered Nurse at the BCJ and an employee of Wellpath during the relevant time period. In that role, she was responsible for the health and welfare of detainees confined in the BCJ, including Ms.

Harris. Defendant Jensen is sued in her individual capacity and acted under color of state law and within the scope of her employment with Wellpath.

11. Defendant Jessica Denissen resides in the State of Wisconsin. She was a Registered Nurse at the BCJ and an employee of Wellpath during the relevant time period. In that role, she was responsible for the health and welfare of detainees confined in the BCJ, including Ms. Harris. Defendant Denissen is sued in her individual capacity and acted under color of state law and within the scope of her employment with Wellpath.

12. Defendant Adeyemi Fatoki, M.D. resides in the State of Illinois. He was employed at Wellpath as a Senior Regional Medical Director and the sited Medical Director for the BCJ during the relevant time period. In that role, he was responsible for providing clinical oversite at, *inter alia*, the BCJ, being on-call, approving medications and referrals, and generally for overseeing and ensuring the health and welfare of detainees confined in the BCJ, including Ms. Harris. Defendant Fatoki is sued in his individual capacity and acted under color of state law and within the scope of his employment with Wellpath.

## IV. STATEMENT OF FACTS

### A. Ms. Harris' Detention

13. On February 9, 2018, Chelsea Harris, a 28-year-old female, was taken into custody by the De Pere Police Department and detained at the Brown County Jail under the care, custody, and control of Brown County and its medical contractors including the above-named defendants.

14. Ms. Harris was detained pursuant to a civil order issued by the Green Bay Municipal Court for alleged failure to pay a civil municipal violation ticket.

15. During the course of Ms. Harris' detention at BCJ, she was never brought before the Municipal Court nor subject to any legal proceedings regarding the municipal ticket.

### B. Ms. Harris' Medical Intake

16. A contract was then in effect between Brown County and CCS (n/k/a Wellpath), under which Wellpath was required to provide, *inter alia*, medical screening, care, and treatment to persons at the Brown County Jail.

17. Wellpath's contract with Brown County for provision of comprehensive medical services at the Brown County Jail required Wellpath and its employees, agents, and independent contractors, including the above-named defendants, to fulfill all constitutionally and statutorily required medical duties of the Brown County Sheriff for persons in custody.

18. At the time of her detention, Ms. Harris was approximately 26 weeks pregnant and her pregnancy was classified as "high-risk" by her two private medical doctors.

### C. Medical Care for Pregnant Women at the Brown County Jail.

19. In February 2018, the BCJ housed both male and female inmates and detainees. Consequently, the BCJ regularly housed pregnant women; and Wellpath was thus responsible for their medical care during their detention/incarceration.

20. The contract in effect between Brown County and Wellpath expressly stated that Wellpath was required to abide by the National Commission on Correctional Healthcare ("NCCHC") Standards with regard to the care of pregnant inmates/detainees.

21. The "essential" NCCHC Standard P-F-05 expressly states, *inter alia*, that "[p]regnant women who report bleeding *or symptoms of labor* such as pain or leaking fluid should be *immediately* evaluated by a qualified heath care professional; when an appropriately

trained health professional is not on-site, there should be consultation with or transportation to the hospital." NCCHC Standard P-F-05 (emphasis added). The NCCHC Standards further recognize that "obstetrical emergencies such as . . . preterm labor can arise at any point in pregnancy. Such emergencies *require immediate medical intervention and/or movement of the woman*." NCCHC Standard P-F-05 (emphasis added).

22. Ms. Harris, who was in preterm labor, a recognized obstetrical emergency, was not immediately transported to the hospital nor was she ever evaluated by a qualified health care professional, which violated the express written NCCHC Standards and standards of professional judgment.

### D. Lack of Medical Care in General Population

23. During BCJ booking intake, Ms. Harris specifically informed the non-medical intake officer that she was 26 weeks into a high-risk pregnancy. This information was noted in the "Booking Observation Report" form completed at intake.

24. Brown County Jail Policies H12 and H3d required the *per se* designation of Ms. Harris' pregnancy as a "special health need" that required the Health Services Unit ("HSU") to create a specialized treatment plan for her.

25. Wellpath Policy G-02 required the *per se* designation of a pregnant female, like Ms. Harris, as a "special needs" patient to be documented on the "problem list" of the patient's medical summary. Furthermore, Wellpath Policy G-02 mandated the creation of "individualized treatment plans" for patients with special needs, which were to be "developed by a physician or other qualified clinician at the time the serious medical or mental health condition is identified."

26. In violation of express Wellpath and BCJ written policies and standards of professional judgment, an individualized treatment plan was never created for Ms. Harris.

27. Despite Ms. Harris' high-risk pregnancy, and in violation of express Wellpath and BCJ written policies and standards of professional judgment, Ms. Harris' "Patient Profile Summary" indicated "No Active Problems," "No Active Diets," and "No Active Special Needs."

28. Instead of being placed in a special needs cell as required by her medical condition, Brown County and Wellpath placed Ms. Harris in general population and assigned her to the India Pod.

29. Furthermore, in violation of express BCJ written Policy H12, which governs how HSU must respond to a pregnant detainee's medical complaints, and in violation of standards of professional judgment, at no point did HSU "confer with a qualified obstetrical practitioner" to "coordinate treatment as appropriate for the well being of the inmate and unborn child" in response to Ms. Harris' medical complaints and obvious medical emergency. Instead, HSU staff simply ignored Ms. Harris' obvious medical emergency and pleas for help.

30. On the evening of February 9, 2018, Ms. Harris experienced a serious pregnancy-related medical emergency that caused great pain, suffering, and, ultimately, the premature birth of her child.

31. A mandatory incomplete assessment of Ms. Harris was completed in her cell at approximately 10:40 PM on February 9, 2018 by Defendant Juntunen-Sullivan, RN. Ms. Harris, again, reported her high-risk pregnancy. Nurse Juntunen-Sullivan documented the following assessment in Ms. Harris' medical file: "Admits to sharp pain to low back for a week, worse today. This pain is accompanied by low, mid abd pain sharp and constant for the

last 2 hours. Rates pain '9' on 1-10 scale." Ms. Harris also reported that she had experienced maroon colored vaginal discharge the day before. These are classic symptoms of preterm labor, which the NCCHC defines as an "obstetrical emergency" that requires immediate medical intervention and transportation to the hospital.

32. Defendant Juntunen-Sullivan knew that the obviously serious nature of Ms. Harris' medical complaints of continuous sharp lower abdominal pain in a high-risk pregnancy evidenced a medical emergency that required immediate medical attention from a qualified medical provider.

33. However, Defendant Juntunen-Sullivan did not seek immediate emergency medical attention or call 911, as she knew she was required to do. She did not even bother to report Ms. Harris' symptoms to an on-call doctor, much less a qualified obstetrical practitioner. Instead, she gave Ms. Harris a Tylenol and chose to ignore Ms. Harris' obvious medical emergency.

34. At approximately 12:30 PM on February 10, 2018, Ms. Harris reported to BCJ Correctional Officer Rupnow, who had also worked in the India Pod the previous day, that she was still experiencing lower abdominal pain. Officer Rupnow noted that Ms. Harris "was sitting in the dayroom and was leaning over and was crying," so he called for a nurse.

35. Wellpath employee, Defendant Diane Jensen, RN, responded and took Ms. Harris to a laundry room within the housing unit.

36. Ms. Harris reported to Defendant Jensen that she was still experiencing the same sharp lower abdominal pain she had reported the previous night and that the Tylenol was not stopping the pain. She additionally informed Defendant Jensen that she was a high-risk pregnancy, had bright yellowish/green vaginal discharge, and that it "felt like a human was trying to exit her body." Ms. Harris demanded to be taken to a hospital.

8

37. Contrary to the mandatory NCCHC Standard P-F-05, and knowing that Ms. Harris presented with classic signs of preterm labor, Defendant Jensen refused to send Ms. Harris to the hospital and stated that she had to call the on-call doctor. However, Defendant Jensen never called the on-call doctor, never consulted with a qualified obstetrical practitioner, and never bothered to check on Ms. Harris at any time thereafter. Defendant Jensen chose to do nothing to respond to Ms. Harris' obvious and serious medical emergency.

38. Defendant Jensen knew from the obviously serious nature of Ms. Harris' medical complaints that:

    a. reports of continuous sharp lower abdominal pain in a twenty-six (26) week high-risk pregnancy evidence a medical emergency that requires immediate medical attention from a qualified medical provider;

    b. reports of yellowish/green vaginal discharge in a pregnancy can signal serious infection that requires immediate medical attention from a qualified medical provider;

    c. a pregnant woman complaining of lower abdominal pain when coupled with vaginal discharge means that her cervix is dilating;

    d. premature labor can have serious and life-threatening consequences for both her and her premature infant; and

    e. reports from a known high-risk pregnant woman only twenty-six (26) weeks into her pregnancy that it "felt like a human was trying to exit her body" required immediate medical attention from a qualified medical provider.

39. Despite this knowledge, and instead of reporting Ms. Harris' medical emergency to an on-call doctor or calling 911, Defendant Jensen told Officer Rupnow that she was "done talking to Harris" and further told Ms. Harris "to go back to her cell."

40. After Defendant Jensen denied Ms. Harris' emergency demand to be taken to a hospital, Officer Rupnow commanded her to go back to her cell, but Ms. Harris refused out of desperation for her medical crisis. She told Officer Rupnow that if no one would send her to the hospital then she wanted to be "put on suicide watch." Ms. Harris knew that her pregnancy was dangerous to her health and the health of her unborn child. She concluded that being placed on suicide watch was the only option to receive desperately needed medical treatment and be monitored. Officer Rupnow called the Housing Corporal and Security to re-house her.

41. Defendant Jensen ignored Ms. Harris' request for medical attention despite the seriousness of her condition and her own observations of Ms. Harris' pain.

42. Ms. Harris' significant pain, suffering, and need for medical attention was obvious and further confirmed by Officer Rupnow's own reported observations of Ms. Harris crying.

43. Ms. Harris received a "Major Conduct Report" issued by a Brown County Jail Intake Corporal for "refusal to lockdown and for major disruption." She was punished with a sentence of four days of punitive segregation to be served after being cleared from suicide watch.

### E. Lack of Medical Care on Suicide Watch

44. After Officer Rupnow escorted Ms. Harris to suicide watch, she was not medically assessed for over ten hours.

45. Ms. Harris was finally seen on February 10, 2018, at approximately 11:30 PM, by Defendant Juntunen-Sullivan, RN, to whom she reported that she was still experiencing a

significant amount of yellowish/green vaginal discharge. This is a classic symptom of preterm labor, which the NCCHC defines as an "obstetrical emergency" that requires immediate medical intervention and transportation to the hospital.

46. Defendant Juntunen-Sullivan knew from her prior medical interaction with Ms. Harris and from the obviously serious nature of Ms. Harris' medical complaints that yellowish/green vaginal discharge in a pregnancy evidences an infection that requires immediate medical attention from a qualified medical provider.

47. Despite the objective seriousness of Ms. Harris' reports, Defendant Juntunen-Sullivan once again chose to do nothing to provide desperately needed medical care to Ms. Harris.

48. Ms. Harris was cleared from suicide watch at approximately 11:40 AM on February 11, 2018, and was moved to India Pod cell 106, where she began her punitive segregation penalty.

### F. Lack of Medical Care in Punitive Segregation

49. During the evening of February 11, 2018, Ms. Harris was assessed in her cell by Defendant Denissen RN, who noted that Ms. Harris was crying and stated "her pain was a 9/10 in the lower pelvic region." Ms. Harris also reported continued vaginal discharge. Defendant Denissen's incomplete assessment fell far below the standard of care.

50. Defendant Denissen recognized that Ms. Harris' condition required prompt medical attention.

51. Defendant Denissen then called the phone number for the on-call physician, Defendant Fatoki, M.D. During that 47-second call, Defendant Denissen RN either simply left a voicemail for the doctor or provided grossly inadequate information to Dr. Fatoki. Defendant

Denissen made no other call to another on-call physician despite the fact that she knew Ms. Harris' condition was urgent and that Wellpath policy instructed her to call another on-call provider in the event Dr. Fatoki did not return her call within 15 minutes.

52. Dr. Fatoki testified that he does not believe he was the recipient of a telephone call because he would have recognized that Ms. Harris deserved to be properly assessed at an emergency room and would not have ordered Tylenol and medical observation had he been aware of Ms. Harris' condition as reported in the medical file.

53. Nurse Denissen testified that she would have only communicated the information contained in her note to the on-call doctor and would not have provided information from the notes of Nurses Sullivan and Jensen.

54. Had Nurse Denissen provided Dr. Fatoki with only the information contained in her note, Dr. Fatoki testified that he still would have at least ordered fluids, Tylenol, and a call back within thirty to sixty minutes; however, no follow-up call was made between Nurse Denissen and Dr. Fatoki.

55. Through phone records obtained from Dr. Fatoki's cell phone provider and the Brown County Jail, Dr. Fatoki had a practice of not answering calls from the Brown County Jail that were made after 10:00 p.m., not following up on those calls, or being very short on those calls. This practice was objectively unreasonable and amounted to an intentional and reckless disregard of the rights of inmates/detainees, including Ms. Harris, at the Brown County Jail.

56. Despite being placed on medical observation, Ms. Harris was neither checked on nor assessed by any Wellpath medical personnel until the evening of February 14, 2018 – *three days later*.

57. During her punitive segregation:

   a. she continued to experience lower abdominal pain, which grew more severe with each passing day. Her pain was obvious and she spent her four-day punitive segregation curled up on her cot and crying;

   b. she continued to experience greenish/yellow vaginal discharge, which soaked through a feminine pad an hour;

   c. Ms. Harris requested feminine pads from guards, some of whom refused to provide them and one guard even dismissively informed her that she "did not need any pads because [she] [was] pregnant" and so she was forced to use toilet paper; and

   d. Ms. Harris continued to fear for her unborn child's life as she was helpless in a cell knowing that she could do absolutely nothing to get desperately required medical care.

58. Despite knowing that Ms. Harris' pregnancy was high-risk, that she was experiencing excruciating lower abdominal pain for days and substantial amounts of yellow/green vaginal discharge, and was on medical observation, no Wellpath medical professional came to assess Ms. Harris from the night of February 11 to the night of February 14.

### G. Wellpath's Failure to Establish Protocols for "Medical Observation."

59. Wellpath failed to adequately supervise, enforce, and train its medical staff and Brown County Jail staff on policies and procedures relating to "medical observation" of

inmates. This failure led to a culture of indifference and inaction among Wellpath's nursing and supervisory staff at the BCJ.

60. Wellpath's known failure to supervise, enforce, and train on appropriate "medical observation" bred a widespread culture and practice of indifference and inaction, which was deliberately indifferent to the medical needs of all inmates/detainees, including Ms. Harris, and was the moving force behind Ms. Harris' injuries.

61. Wellpath Clinical Coordinator, Emily Blozinski, LPN, acknowledged that there was not a set definition of what "medical observation" means.

62. No Wellpath nurse or physician provided any direction to correctional staff as to what they should be observing specific to Ms. Harris' condition.

63. The absence of medical attention while on "medical observation" is a result of Wellpath's failure to establish protocols for the management of inmates/detainees placed on medical observation, as well as the failure to train medical and correctional staff thereon.

64. There is little doubt that Wellpath would have known that they would be confronted with inmates/detainees who required "medical observation." Thus, the need for a well-defined policy and training thereon was obvious.

65. Furthermore, by failing to implement such policies and provide relevant training with regard to medical observation, Wellpath consciously chose a policy of inaction, when faced with the known risk that without such implementation and training, some inmates'/detainees' constitutional rights would be violated.

66. This conscious choice was deliberately indifferent to the need for established "medical observation" protocols, and the absence of these established protocols was the moving force behind Ms. Harris' injuries.

67. Had Wellpath established medical observation policies and provided necessary training thereon, then she would not have been ignored for three days while on "medical observation" and in dire pain and experiencing preterm labor.

### H. Ms. Harris is Finally Taken to the Hospital

68. On February 14, 2018, Ms. Harris experienced contractions every four to five minutes and had not felt her baby move all day.

69. Ms. Harris could be heard gasping in pain, struggling to breathe, and crying doubled over in pain while having contractions during a phone conversation with her fiancé that was monitored and observed by BCJ staff.

70. During another monitored phone call with her fiancé, Ms. Harris stated that she was in severe pain and was extremely emotionally distressed from the pain of her contractions. After this phone call, Ms. Harris' fiancé called the BCJ front desk to express his concern for Ms. Harris and his unborn daughter's life.

71. At approximately 6:35 PM on February 14, 2018, Ms. Harris yet again requested to see a nurse.

72. When a Wellpath nurse finally arrived at Ms. Harris' cell three hours later, Ms. Harris reported that she continued to have contractions that she described as constant, stabbing lower pelvic pain, and she reported green/yellow vaginal discharge. That nurse immediately contacted the on-call nurse practitioner, who directed the nurse to immediately send Ms. Harris to the local hospital emergency room.

### I. Treatment and Prolonged Hospitalization

73. When Ms. Harris arrived at the emergency room, she was immediately taken to the labor and delivery unit where it was determined that she was dilated four (4) centimeters and

had experienced a preterm, premature rupture of membranes. She was immediately given medication to stop labor and postpone delivery as long as possible and was also given broad-spectrum antibiotics for a suspected infection.

74. Ms. Harris remained hospitalized for her serious medical conditions, significantly exacerbated by her lack of medical treatment at the BCJ, for almost two weeks.

75. On February 25, 2018, Ms. Harris gave birth to a Baby Girl, "J." who was not due until May 19, and who weighed only two (2) pounds and ten (10) ounces.

76. As a direct consequence of the constitutionally deficient medical care Ms. Harris received in the Brown County Jail for four days, she was subjected to unnecessary pain and suffering during a labor that spanned for over ten (10) and one-half days.

77. Baby girl "J." remained in the neonatal intensive care unit ("NICU") for over two and a half months, and was not released until May 6, 2018.

78. As a direct consequence of the deficient medical care Ms. Harris received in the Brown County Jail, Ms. Harris suffered a loss of society and companionship with Baby Girl "J." for the first two and a half months of her daughter's life. Ms. Harris was unable to hold or even touch Baby Girl "J." for the first 72 hours of her life. Ms. Harris felt like a helpless bystander observing her fragile new baby in an incubator, hooked up to machines, and fighting for her life. Ms. Harris was unable to breastfeed or hold Baby Girl "J." when she cried, and was unable to take her daughter home for two and a half months. Instead, Ms. Harris left her baby every night fearing that she would not be alive the next day. Even after Baby Girl "J." was released from the hospital, the direct consequences of the deficient medical care her mother received at the BCJ continued. Ms. Harris had to hire a home visit nurse to provide weekly medical care to Baby Girl "J." resulting from her premature birth and also to treat

medical concerns regarding her eyes, hearing, and low birth weight caused by her premature birth.

## V. STATEMENT OF CLAIMS

### Constitutional Claims

79. Brown County took Chelsea Harris into legal and physical custody as a civil detainee, thereby establishing a special custodial and supervisory relationship toward her by Brown County and the individually named defendants herein to provide necessary medical care. Brown County contractually delegated and shared this duty with Wellpath. This special custodial and supervisory relationship consequently gave rise to affirmative contractual legal duties by Wellpath and its employees, agents, and contractors to secure Ms. Harris' liberty interests and rights, including her physical safety, essential medical care and treatment, and her right to be free from unnecessary pain and suffering, substantive rights protected by the Fourteenth and Eighth Amendments to the U.S. Constitution – rights which Wellpath violated.

80. Wellpath failed to establish protocols for the management of inmates/detainees placed on medical observation and failed to train medical and correctional staff thereon. The inaction to the obvious knowledge that they would be confronted with inmates/detainees who required medical observation demonstrates deliberately indifference, recklessness, and objective unreasonableness to the need for established "medical observation" protocols, and the absence of these established protocols was the moving force behind Ms. Harris' injuries.

81. Each individual defendant is liable under 42 U.S.C. § 1983 for violating Ms. Harris' rights under the Fourteenth and Eighth Amendments to the United States Constitution by denying her necessary medical care. Each defendant acted objectively unreasonably, with an absence of professional judgment, and with deliberate indifference to Ms. Harris' obvious and

known serious medical needs. Each defendant was aware of the foreseeable risks associated with his or her actions and inactions, which caused Ms. Harris to suffer unnecessary physical and emotional pain, injury, and loss of society and companionship with Baby Girl "J." in violation of her Fourteenth and Eighth Amendment rights.

State Law Negligence Claims

82. Pursuant to Wis. Stat. § 893.80(1d)(a), on June 1, 2018, counsel for Ms. Harris served the Brown County Sheriff's Office, Brown County Clerk, and Wellpath with a written Notice of Circumstances of Injury.

83. Pursuant to Wis. Stat. § 893.80(1d)(b), on October 10, 2019, counsel for Ms. Harris served the Brown County Sheriff's Office, Brown County Clerk, and Wellpath with a written Notice of Claim.

84. On January 13, 2020, Brown County served Ms. Harris with a formal notice of disallowance of the claim.

85. The conduct of Wellpath and the above-named individual defendants violated their respective duties of care toward the plaintiff and were a substantial factor in causing Ms. Harris' injuries.

86. Defendants Juntunen-Sullivan, RN, Jensen, RN, and Denissen, RN negligently ignored Ms. Harris' known complaints and their own observations of her serious medical condition.

87. Defendant Fatoki was negligent in not responding to the call of Denissen, or alternatively, in the medical care and direction he provided.

88. The negligence of Defendants caused Ms. Harris pain, suffering, and injury.

89. Wellpath, through its employees and agents, was negligent in the assessment, medication management, treatment, and rendering of medical care to Ms. Harris, which caused pain and suffering and emotional distress and other injuries, and Wellpath is liable for the plaintiff's injuries sustained as a result of the negligent acts of its employees and agents.

90. Defendant Wellpath negligently failed to adequately train and supervise its employees and agents at the Brown County Jail, which caused Ms. Harris' pain and suffering and injury.

91. Defendant Wellpath is liable for all negligent acts and omissions of their employees, agents, and contractors.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully demands a jury trial and prays that this Court:

1. Enter judgment for plaintiff and against each defendant, jointly and severally, awarding compensatory damages against each defendant, and punitive damages against each defendant.

2. Award pre-judgment and post-judgment interest, together with costs, disbursements, and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

3. Award such other relief as may be just and equitable.

4. Ms. Harris also seeks a determination as to the amount, if any, owed to the Involuntary Plaintiffs.

Dated at Milwaukee, Wisconsin, this 1st day of July, 2021.

                                                FIRST, ALBRECHT & BLONDIS, s.c.
                                                Attorneys for Plaintiff

s/James P. End
James P. End
State Bar. No. 1032307
jend@fabattorneys.com

s/Alexa C. Bradley
Alexa C. Bradley
State Bar No. 1102009
abradley@fabattorneys.com

Lawrence G. Albrecht
State Bar No. 1015668
lalbrecht@fabattorneys.com


Broadway Theatre Center
158 North Broadway, Suite 600
Milwaukee, WI 53202
Telephone: (414) 271-1972
Facsimile: (414) 271-1511

20